## FIDELITY & DEPOSIT CO. OF MARYLAND v. MOSHIER et al.

(Circuit Court, N. D. New York. March 23, 1907.)

1. EXECUTORS AND ADMINISTRATORS—LIABILITY ON BOND—FALSE REPRESENTATIONS TO SURETY.

A man owning a mercantile business died intestate, leaving a considerable indebtedness; the largest creditors being his father and mother. At a meeting of the family, at which his father and mother were present, it was ascertained that his personal estate was insufficient to pay his debts, and, at the suggestion of his father, it was agreed that the widow and oldest son should be appointed administrators, and that, instead of settling up the estate according to law, they should continue the business and first pay up the indebtedness to outside creditors. On their appointment they procured complainant to become surety on their bond by making materially false representations as to the condition of the estate in their application, and also promissory statements which they did not intend to, and did not, fulfill. The business was carried on for over a year, using money of the estate, and then sold to the administrators and others, who thereafter became insolvent. On final settlement of their accounts they were charged with a considerable sum as in their hands which they were unable to pay. All creditors of the estate had been paid except the decedent's father and mother. *Held* that, as against them, complainant was entitled to a cancellation of its bond as having been procured by false representations to which they were privy, as well as to the maladministration of the estate.

2. SAME—LIABILITY OF SURETY—JURISDICTION TO DETERMINE.

A surrogate in New York has jurisdiction to settle the accounts of administrators and to fix the amount of their liability to creditors or next of kin and also of their surety, provided such liability exists, but not to determine the validity of their bond as between the surety and the creditors or next of kin or any of them, which may be litigated and determined in

any other court having jurisdiction of the subject-matter and the parties.

**3. SAME—DUTIES—VIOLATION OF LAW.**

Under Code Civ. Proc. N. Y. §§ 2717–2719, prescribing the duties of administrators, an agreement between administrators and others by which they are to continue the business of a decedent, who is indebted, not for the benefit of the estate or its creditors, but of others, is one to violate the law and to do an illegal act.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 22, Executors and Administrators, §§ 407, 408.]

**4. COURTS—JURISDICTION OF FEDERAL COURT—AMOUNT IN CONTROVERSY.**

A suit by a surety for cancellation of a bond for $40,000, on which, if valid, complainant is subject to a liability exceeding $2,000, involves a sufficient amount to confer jurisdiction on a federal court.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, §§ 890–893.

Jurisdiction of Circuit Courts as determined by the amount in controversy, see notes to Auer v. Lombard, 19 C. C. A. 75, and Tennent-Stribling Shoe Co. v. Roper, 36 C. C. A. 459.]

Action in equity for the cancellation of a bond written by the Fidelity & Deposit Company, a corporation of the state of Maryland, for said defendants Carrie H. Moshier and James C. Moshier, as administrators of the estate of Charles Moshier, deceased, on the ground of fraudulent representations made and of the fraudulent concealment of alleged material facts at the time said bond was written and delivered, and which, it is alleged, induced the writing and delivery of said bond.

Risley & Love, for complainant.

W. A. Matteson, for defendants Sarah M. Moshier and Albert C. Boshart.

RAY, District Judge. Charles Moshier, of Oneida county, N. Y., engaged in business as a tea, coffee, and spice merchant at Utica, N. Y., died intestate at Utica aforesaid September 18, 1899. He left him surviving a widow, Carrie H. Moshier, and James C. Moshier, William R. Moshier, Mae Moshier, and Floyd J. Moshier, his children and his only heirs at law and next of kin, all of whom are defendants herein. He also left him surviving his father and mother, Sarah M. Moshier and John G. Moshier. Thereafter and subsequent to the writing of the bond in suit, and in December, 1899, said John G. Moshier died, leaving a last will and testament, which was duly probated, and the defendant Albert C. Boshart was thereupon duly appointed executor thereof and now is such executor. At the time of his death Charles Moshier was indebted to his father, said John G. Moshier, in the sum of about $5,000, and to his mother, said Sarah M. Moshier, in the sum of about $11,000. He was also largely indebted to other creditors. I do not find in the record any inventory of the estate of said Charles Moshier or any statement of its actual value at the time of his death. Therefore it is impossible to ascertain the exact or even approximate interests of the parties at that time. Shortly after the funeral services of said Charles Moshier, at a conference of certain of the interested parties, a statement was read setting forth the value of the personal as $24,000; of the equity in real estate as

$22,000; total, $46,000; and of the indebtedness, aside from liens on real estate, as $29,500; other contingent liabilities payable from personalty, and which were paid, $1,806.25. These personal assets were said to consist of good accounts $15,000; stock, fixtures, etc., $9,000; total $24,000. The liabilities were stated to be accounts payable $9,000 and bills payable $20,500, and contingent liabilities which proved to be $1,806.25. It was known, therefore, to the parties present that the liabilities of the intestate, not including liens on real estate, exceeded the personal estate by $7,306.25, and that, if the estate was settled in due course by converting the personal into money and applying it to the payment of the debts and expenses, it would only pay a percentage, and that the real estate must be resorted to in due proceedings.

At the conference referred to there were present said John G. Moshier and Sarah M. Moshier, the largest creditors, said Carrie H. Moshier, and said James C. Moshier, one H. C. Sholes, the attorney for James C. Moshier, George M. Orton, bookkeeper, and one James B. Phillips, the father of Carrie H. Moshier, and others. It was then and there, in substance, understood and agreed that, instead of closing up the business in due course and making a legal settlement of the estate in accordance with law, the business should be run for an indefinite period, which included the purchase of property in the business and the sale of same even on credit, there being no limitation, and the general understanding being to continue it in the same manner it had been conducted by the intestate in his lifetime; that the outstanding accounts should be collected and the debts paid, except those due and owing to said John G. Moshier and Sarah M. Moshier, which were to wait. This was the proposition of said John G. Moshier, and was expressly assented to by Sarah M. Moshier. He expressly stated he wanted the "boys," referring to the children of the intestate, to have the business. It is also true that it was understood and assented to that the administrators of the estate, when appointed, should thus continue and run the business in the interest of the sons, and that the widow, Carrie H. Moshier, and the eldest son, James C. Moshier, should be appointed administrators. It is evident that here was an understanding and agreement to put this personal estate into the hands of administrators, and that they should manage and conduct and continue it, not in accordance with law, not in the proper discharge of their duty as such administrators, not in the interest of all the creditors, but in the interest of those creditors not a party to the agreement and of the sons. Thereafter application was duly made for the appointment of said Carrie H. Moshier and James C. Moshier as administrators of said estate, and they, under their hands and seals, on the 26th day of September, 1899, applied to the complainant to write and execute for them as such administrators and as their surety a bond in the penal sum of $40,000, conditioned as required by the laws of the state of New York. This application contained certain promissory statements, among others, in substance, that the funds of the estate would be deposited to their credit as administrators; that the funds would not be invested, but, "as soon as notice to creditors expires, will be used so far as necessary to pay debts and balance held for distribu-

tion at end of year." As to existing facts, they stated the value of accounts and notes to be $12,000; of stock and machinery to be $8,000; real estate to be $50,000. They gave the liabilities of the estate as "accounts in said business about $10,000; notes about $4,300; mortgage on real estate $18,000." It is evident that, in view of the knowledge they had gained at the interview referred to, here were materially false statements and representations, unless it was intended and understood and agreed the claim of the father and mother of the intestate were to be excluded as liabilities. All the representations and statements were certified to be true. No mention was made of the arrangement, understanding, and agreement above stated, and that agreement was not made known to the Fidelity & Deposit Company, the complainant here, at any time until during the accounting. It is quite apparent that had it been made known the complainant would not have written and issued the bond in question. It was the concealment of a material fact. The applicants also stated that it would "deposit all moneys and funds belonging to the estate now on hand, and also such moneys and funds as may come into our hands, from time to time, during the administration of said estate, from any source whatever, in the bank or banks aforesaid; such money to be withdrawn only upon checks in our fiduciary capacity for the purposes connected with the administration of the trust."

Instead of administering the estate in the mode and manner required by law, the administrators ran the business as though it had been their own individual property, and bought and sold and gave credit, and acted in conformity with such agreement and understanding, until December, 1900, when the business, not including accounts, was sold by them to said Carrie H. Moshier and James C. Moshier, the administrators, said William R. Moshier, and one Judson C. Phillips, for the sum of $6,000, its alleged full value. This included the stock, fixtures, and machinery. The inventoried value of the stock, fixtures, and machinery at the death of the intestate was $6,943.86. The administrators acted on the understanding had and agreement made and carried it out to the best of their ability, and Boshart and Mrs. Boshart and Mrs. Shumway had actual knowledge of the agreement and of what was being done under it. The administrators paid off all the debts owing by the intestate at the time of his death, except the said claims of said John G. Moshier and said Sarah M. Moshier. All the profits made and money received was used to pay creditors at the death of the testator and the debts incurred in running the business. Said John G. Moshier died in January, 1900, but before his death, and in November, 1899, he transferred the said note of about $5,250, which he held against said estate and before mentioned without consideration, to Albert C. Boshart, his son-in-law, who thereafter became the executor of his last will and testament. Boshart was to collect the note and pay one half to his wife, who was present when the agreement as to running and continuing the business was made, and the other half to a Mrs. Shumway, both of whom were daughters of said John G. Moshier. Hence their facilities for knowledge and actual knowledge. In May, 1901, said administrators, Carrie H. Moshier and James C. Moshier, made and filed their account as such in the Surrogate's Court of

Oneida county, N. Y. The complainant here was cited to attend such accounting. The account as rendered was objected to in various respects by Boshart and Mrs. Moshier as creditors. They claimed, amongst other things, that the estate sold at the time of the sale, in 1901, was of greater value by $2,326.64 than the price paid by the purchasers, and charged to the administrators in the account. The surrogate surcharged their account with said sum of $2,326.64, and charged them, including an alleged "profit" made in the business, with $22,658.17 and credited them expenses $2,031.18, debts of intestate paid $16,132.19, and premium paid on bond $125, in all $18,-288.37, thus leaving or showing a balance in their hands of $4,369.80. Of this sum they are ordered, adjudged, and decreed to pay to said Sarah M. Moshier on account of her claim on said note held by her of about $11,000 the sum of $1,968.05, and to said Albert C. Boshart on account of his claim on the said note of about $5,000, the sum of $742.83; also counsel fee $660.79.

It is claimed that the complainant has suffered no damage or loss by reason of the concealed agreement for the maladministration of the estate, inasmuch as the surrogate has found and charged the administrators with a profit realized from the business, and therefore, as no loss was sustained in carrying on the business in the manner stated for about one year and four months, the complainant is not entitled to any relief. But this contention fails to take into consideration the further fact of the delay in closing up the estate, the expense of the running of the business, the time the administrators put into it and their living expenses during that time, for which no compensation or remuneration was or could be allowed, and that soon after the purchase by the administrators and the others named all became insolvent and made an assignment. It fails to take into consideration the change of conditions, the increased peril of the surety, and the fact that by reason of the agreement the complainant became surety, not for the faithful performance of their duties by the administrators, but for a violation of their duty, a fact which Sarah M. Moshier and John G. Moshier knew, for they are presumed to have known the law and the legal effect of such an agreement. The administrators cannot now make good and pay the amount of the decree; and, if the relief asked is not granted, the complainant must make up the deficiency. This condition or situation is largely the result of the action, advice, and procurement of said John G. Moshier, assented to and sanctioned by Sarah M. Moshier. Neither of them took any action whatever to have the estate closed or made any objection to the manner of conducting the estate, nor did Boshart until after the failure of the administrators.

The question, then, is: Can this bond of the administrators, executed by the surety company, be canceled so far as those persons are concerned, or its enforcement against it by them be enjoined, because of the fraudulent concealment of the agreement followed by its execution, the one being a party to the agreement and not having disclosed it, and the other without consideration claiming under and through another who was also a party to the agreement and did not disclose it? Neither was a party to the application for the bond, but both knew a bond must be given, and both knew that the carrying

out of the agreement constituted a violation of law and the maladministration of the estate, and a violation of the condition of the bond which was as follows:

"The condition of this obligation is such that if the above bounded Carrie H. Moshier and James C. Moshier shall faithfully execute the trust reposed in them as administrators of all and singular the goods, chattels, and credits of Charles Moshier, deceased, and obey all lawful decrees and orders of the Surrogate's Court of the county of Oneida touching the administration of the estate committed to them, then this obligation to be void, else to remain in full force and virtue."

In short, they knew they had contracted with the administrators in advance that they would and should violate the condition of their bond and increase the peril and obligation of the surety or sureties on their bond. Can one who induces and agrees with another that such other shall violate a trust obligation and duty which he is about to undertake for the benefit of that one and others, and which it is agreed he shall undertake and for the faithful performance of which duty and obligation that other is to and does furnish surety, have any benefit or remedy on the undertaking of the surety, even if such one obtains no pecuniary benefit, or gain, or advantage, but, on the contrary, suffers a loss from such breach of duty? A statement of the proposition would seem to furnish its own answer. The contract of the administrators is that they will faithfully perform and discharge their duties according to law, account and pay over, etc. In reliance thereon, the surety furnishes the bond and undertakes on its part to answer for any and all violations of its conditions. This obligation extends to and protects all persons interested in the estate. If, however, the administrator, being a distributee and entitled to share, wastes the estate, it is clear he cannot look to the surety to make good to him his own default. Is it not equally clear that all persons entitled to share in the estate in any way who have induced and procured such default and waste and violation of the condition of the bond are precluded from enforcing or taking any benefit under it? Is it not a fraud on the surety? The court will not stop to investigate and ascertain just how much injury has been done to the surety by such action, but will hold the surety released from all liability thereon and all responsibility to such wrongdoers. Public policy requires such to be the rule. Such agreements and understandings should be discouraged, else no surety on the bond of an administrator is safe.

In Griswold v. Hazard, 141 U. S. 260, 286, 11 Sup. Ct. 972, 980 (35 L. Ed. 678), the Court thus states the law, quoting 1 Story's Eq. Juris. §§ 324, 215:

"If a party taking a guaranty from a surety conceals from him facts which go to increase his risk and suffers him to enter into the contract under false impressions, as to the real state of the facts, such a concealment will amount to a fraud, because the party is bound to make the disclosure."

That court then says:

"To the same effect are Franklin Bank v. Cooper, 36 Me. 180, 196; Smith v. Bank of Scotland, 1 Dow. 272, 292; Railton v. Mathews, 10 Cl. & F. 935, 943; Small v. Currie, 2 Drewry, 102, 114; Phillips v. Foxall, L. R. 7 Q. B. 666, 672; Pidcock v. Bishop, 3 B. & C. 605; Adams' Equity, § 179."

There are numerous authorities sustaining the proposition, which, indeed, cannot be intelligently questioned as sound in law, equity, and morals. If such a concealment is a fraud, it avoids the instrument secured by it as to the party actively practicing the fraud or securing it by such concealment of facts. And, if nonenforceable by him for his own benefit, it must be equally nonenforceable by or for the benefit of all persons privy to the fraud, or who took part in inducing it or procuring it to be perpetrated. In Riggin et al. v. Creath, 60 Ohio St. 114, 53 N. E. 1100, it was decided, reversing the Circuit Court:

"A distributee, having pursuant to a private arrangement with one of two joint executors, accepted his individual check for the amount of her distributive share, and, in consideration thereof assented to the delivery of her share of the fund to such executor and executed her receipt in full to the executors on account of such share, cannot, upon the dishonor of the check, maintain an action against the executors and the sureties upon their joint bond; the act of the executor in drawing his individual check being apart from his duties in the execution of the trust."

In that case neither the coexecutor nor the sureties had any knowledge of the transaction. In giving his check, said the court, Riggin "acted wholly apart from his duties as executor." In McCanna & Fraser Co. v. Citizens' Trust & Surety Co. of Phil., 76 Fed. 420, 24 C. C. A. 11, 35 L. R. A. 236, the Circuit Court of Appeals, Third Circuit, held:

"A surety bond taken as security for the conduct of an agent of a foreign corporation which undertakes to do business in Pennsylvania without complying with the requirement of the second section of Act April 22, 1874, that a statement showing the title and object of the corporation, the location of its officers, and names of its agents, etc., shall be filed in the office of the secretary of the commonwealth, is invalid."

And in the opinion the court said:

"It will be observed that the court in its construction adopts the principles of the case of Thorne v. Insurance Co., in which it was held that, when a foreign insurance company has not complied with the act under which alone it is authorized to transact business in Pennsylvania, there can be no recovery by the company upon a bond given by its agent, with sureties, conditioned for paying over moneys of the company received by him. Johnson v. Hulings, 103 Pa. 498, 49 Am. Rep. 131, is to the same effect. Thus it results, that the bond in suit must be regarded as taken to protect the plaintiff while engaged in prosecuting its business in violation of law. It is substantially a contract to protect the plaintiff against loss while engaged in violating the law. It requires no argument to demonstrate that such a contract is invalid. The point made by the plaintiff's counsel, that, inasmuch as the appointment of the agent was lawful, the bond taken as security for his conduct is not liable to the objection urged, is ingenious, but is not sound. The conduct contemplated relates to his prosecution of the unlawful business stated. It is true that the defendant may not have known or supposed that the business would be undertaken without compliance with the statute. It is immaterial, however, what the defendant's understanding was in this respect. It must be inferred that the plaintiff contemplated a disregard of the law from the beginning, inasmuch as he subsequently violated it. In any view that can be taken of the subject, the fact remains that the plaintiff is seeking to enforce a contract entered into for the purpose of securing it in conducting a business forbidden by law; and such a contract is necessarily void."

I cannot see any difference in principle between that case and the one now at bar. There the surety company did not know the obligee

named in the bond and for whose benefit it was given had not complied with the law, or was carrying on business in Pennsylvania contrary to law. There the person for whom the principal in the bond, the obligor, was to work and for whose honest performance of duty the surety became responsible was engaged in violating the law, and consequently the principal in the bond was also aiding in violating the law because acting as his agent or employé. Consequently the surety's obligation and undertaking to the one for whose benefit the bond was given, the obligee, was to answer to him for the default of one engaged in doing business at his request, which was being done in violation of law. Here the obligor in the bond was violating the law in carrying on the business as it was being done and in the manner it was agreed it should be done; and these persons for whose benefit and protection the bond was given were parties to and had assented to this illegal performance or nonperformance of the duties of the trust. It is immaterial that the acts done and which it was agreed should be done did not constitute crimes. It is all sufficient that they were illegal acts. In Thorne v. Insurance Company, 80 Pa. 15, 21 Am. Rep. 89, the agent of the company gave to it a bond, with sureties, conditioned for the payment to it of its moneys collected by him, such agent. The company, a foreign insurance company, had not complied with the provisions of the statutes, a compliance with which was a condition precedent to its doing business in the state. It was made illegal for such a corporation to do business in the state without complying with such conditions. Held there could be no recovery on the bond.

In Weed & Weed v. Bentley, 6 Hill (N. Y.) 56, the defendant Bentley in May, 1832, indorsed a note for $500 made by one Geo. W. Hicks, which became due September 24, 1832. Prior to September, but after the giving of the Hicks note, defendant became embarrassed in his pecuniary affairs, and was indebted to the plaintiffs, Weed & Weed, in a large amount over and above his contingent liability on the said Hicks note. A composition was arranged between plaintiffs and defendant, said indorser, by the terms of which Bentley was to be discharged from all his indebtedness on giving his own notes to plaintiffs, signed by one Fouquet as surety, for and to the amount of ten shillings on the pound of such indebtedness, and also his own note for $539.48 or two shillings and six pence on a pound in addition. Fouquet was given to understand that the notes so indorsed by him for the ten shillings on the pound paid Bentley's indebtedness in full, and that such was the agreement, and he was not advised of that part of the agreement between the Weeds and Bentley for the giving of the note for $539.48. That part of the agreement was kept secret from Fouquet. The notes were given pursuant to the agreement, and those signed by Fouquet were paid as they became due, and then suit was brought by the Weeds against Bentley on the note for $539.48 given by him for the 2½ shillings over and above the amount to be paid as per the agreement as communicated to Fouquet. Bentley defended on the ground that the giving of the note in pursuance of this agreement, a part of which was kept secret from Fouquet, was a fraud upon Fouquet, and that no recovery could be had thereon even against Bentley. The defense was held good. The court said:

"The taking of the note, under the circumstances, operated as a fraud upon Fouquet, and this constitutes a complete defense even as it respects Bent.ey. 'It is clear,' said Ashurst, J., in Jackson v. Duchaire, 3 T. R. 552, 'both on the principles of law and equity, that when any friend advances money to relieve another' person from the pressure of his necessities, and the parties interested enter into a private agreement over and beyond that with which the friend is acquainted, such agreement is void in law, as being a fraud on such friend.' The principle of the case is directly against the right of the plaintiffs to recover on the note in question. A similar doctrine was laid down and applied in Steinman v. Magnus, 11 East. 390, where the attempt to collect of the debtor the residue of the debt, beyond the amount compounded for and secured, was regarded as a fraud upon the surety which constituted of itself a bar to the action. See, also Cockshott v. Bennett, 2 T. R. 763."

In the case at bar the secret agreement as to the conduct of the estate was a fraud upon the surety, and the bond secured of the surety company to further the execution of such agreement, to make its execution possible, was void as between that company and all parties who took part in perpetrating the fraud, and no such party can take any benefit under it or maintain or cause to be maintained any action upon it for his or her benefit.

In Howe Machine Co. v. Farrington, 82 N. Y. 121, 125, 126, the rules are thus stated by Judge Andrews:

"If any fraud was practiced by the plaintiff to induce the defendant to become surety for Davis, the bond cannot be enforced. The nondisclosure of material facts known to the plaintiff, and of which the defendant was ignorant, which it was the duty of the plaintiff to communicate to the defendant when he entered into the guaranty, would operate as a fraud and relieve him from liability. There may be circumstances known to a party taking a guaranty for the conduct of another of so decisive a character that it could not be supposed that, if known to the surety, he would have entered into the obligation, and in such a case the party taking the security cannot withhold the information and enforce the obligation. The case of a master who takes a bond for the fidelity of a servant or agent, who had previously embezzled his property, and whom he knew to be dishonest and unworthy of confidence, without disclosing the facts known to him, is an illustration. The master in the case supposed could not innocently be silent. In demanding security for the honesty of the servant, he impliedly represents that to his knowledge he is not dishonest, and the application for security, as said by Lord Eldon, in Smith v. Bank of Scotland, 1 Dow's Parl. R. 272, is a 'holding of the servant forth to the sureties as a trustworthy person.' See, also, Railton v. Mathews, 10 Cl. & Fin. 934; Phillips v. Foxall, L. R. 7 Q. B. 672. The basis of the defense of nondisclosure is fraud, and, if the noncommunication is not fraudulent in fact or law, the defense is not established, and the rule which prevails in contracts of marine insurance that all material circumstances known to the assured must be disclosed, and that the omission to do so avoids the policy, though the concealment is not fraudulent, does not apply to an ordinary guaranty. North British Ins. Co. v. Lloyd, 10 Exch. 523. The concealment which will avoid a guaranty need not necessarily have been with a view to the advantage of the person taking it. If designed to prejudice the surety, and prejudice results from the concealment, it is sufficient to constitute a fraud, which will avoid the obligation. Railton v. Mathews, supra. In Hamilton v. Watson, 12 Cl. & Fin. 109, Lord Campbell, in speaking on the subject of disclosure to a surety of facts known to the party to whom he becomes bound, says: 'I should think this might be considered as the criterion, whether the disclosure ought to be made voluntarily, namely, whether there is anything that might not usually be expected to take place between the parties to the transaction.' "

It will be noted that "the concealment which will avoid a guaranty need not necessarily have been with a view to the advantage of the

person taking it," and that the criterion as to the concealment which will constitute fraud is "whether the disclosure ought to be made voluntarily, namely, whether there is anything that might not usually be expected to take place between the parties to the transaction." Here, clearly, it was not to be expected by the surety company that, by virtue of an agreement between two of the creditors and the persons about to be appointed administrators and others interested, the estate was not to be and would not be administered according to law, but in violation of law. And it should be noted that John G. Moshier, the heaviest creditor, was interested in keeping the business for his grandchildren, and declared in making the agreement he desired it kept for them. It is immaterial that his interest was not to make a pecuniary gain for himself.

There are numerous cases to the same effect in this country and England. In 1 Brandt, Suretyship & Guaranty, § 473, p. 885, the rule is stated as follows:

"The test as to whether the disclosure should be made voluntarily is whether there be a contract between the debtor and the creditor to the effect that his position shall be different from that which the surety might naturally expect."

In Hamilton v. Watson, 12 Cl. & Finn. 109, that was stated as the rule by Lord Campbell. Here there was a contract or agreement entered into by the parties now claiming under the bond and their predecessors in interest that the administrators should hold and carry on the business for an indefinite period, buying and selling and treating it as their own for such purposes, incurring all the perils and hazards of such a business, instead of converting it into money with reasonable diligence and applying the fund to the payment of the debts pro rata, and then resorting to the real estate for the payment of the balance, and so closing up the estate within the time fixed by law. The surety had no reason to suspect the existence of such an agreement, which was expressly negatived, however, by the declaration contained in the application for the bond before quoted. Nor did the surety, Fidelity & Deposit Company, anticipate they would be called upon to answer for "profits" made by the administrators in running a mercantile business for the benefit of either the creditors or the widow and next of kin of the intestate. In 1 Brandt, Suretyship & Guaranty, § 474, pp. 886, 887, it is said:

"It has been held that 'one who becomes surety for another must ordinarily be presumed to do so upon the belief that the transaction between the principal parties is one occurring in the usual course of business of that description, subjecting him only to the ordinary risks attending it, and the party to whom he becomes a surety must be presumed to know that such will be his understanding, and that he will act upon it unless he is informed that there are extraordinary circumstances affecting the risk. To receive a surety known to be acting upon the belief that there are no unusual circumstances by which his risk will be materially increased, well knowing that there are such circumstances, and having an opportunity to make them known, and withholding them, must be regarded as a legal fraud, by which the surety will be relieved from his contract.' * * * It is a clear and well-settled principle that a security given by a surety is voidable on the ground of fraud, if there is, with the knowledge or assent of the creditor, such a misrepresentation to, or concealment from, the surety of the transaction between

the creditor and his debtor, that but for the same having taken place either the suretyship would not have been entered into at all, or, being entered into, the extent of the surety's liability might be thereby increased."

The author cites Franklin Bank v. Cooper, 36 Me. 179, and Doughty v. Savage, 28 Conn. 146. The author cites other cases to the same effect, which it is not necessary to quote, as there can be no question as to the rule of law. In the succeeding sections the author states the law and cites cases as to when it is, and when it is not, the duty of the persons obtaining or accepting the surety to make disclosure. The rule as applicable to this case has been stated, and is not questioned in any of the authorities.

In this state the bond of an administrator runs to the people; but it is not given for the benefit of the people at large. It is for the protection of the next of kin and creditors, and may be enforced for their protection and benefit. If they, acting in unison, procure or assent to a violation of its conditions by the principal, and they are violated accordingly, the surety is discharged. If any one of them procures or assents to a violation of its conditions by the principal, and its provisions and conditions are violated, accordingly the surety is discharged from all liability and responsibility to such wrongdoer. It is immaterial that the violation is agreed to and assented to in advance of its execution. If the agreement be executed, no wrongdoer can take any benefit under it. And the surety in defending against such participants in the wrong is not compelled to point out wherein and to what extent he was injured for the agreement and concealment constituted a fraud upon him, which, as to such wrongdoers, vitiates the contract of suretyship and releases the surety. The bond is, of course, good as to all persons who did not participate in the fraud, except those who succeed without consideration—that is, without having paid a consideration in good faith—to the rights and interests of one who did participate in the fraud.

The surrogate of Oneida county, on the settlement of the accounts of the administrators, had jurisdiction to settle and allow the accounts and determine the amounts due to the creditors and widow and next of kin from the administrators as such. That adjudication and decree fixes the amount of the liability of such administrators to the creditors and widow and next of kin, and also the amount of the liability of the surety to the creditors, etc., if there be any liability; but it does not deal with the question of the obligation of the surety to respond to such creditors, widow, or next of kin, or with the validity of the bond as between the surety and such parties. Of that question neither the surrogate nor the Surrogate's Court had jurisdiction. That court is one of limited jurisdiction and powers which are defined by statute. The Fidelity & Deposit Company, the complainant here, could not have raised and procured an adjudication of the question of the validity of the bond in the Surrogate's Court, even had it desired so to do. Consent cannot confer jurisdiction of the subject-matter of any controversy on any court. These propositions are covered by the following cases: Matter of Randall, 152 N. Y. 508, 520, 46 N. E. 945; Stilwell v. Carpenter, 59 N. Y. 414; Bevan v. Cooper, 72 N. Y. 317;

Matter of Wagner, 119 N. Y. 28, 23 N. E. 200; Sanders v. Soutter, 126 N. Y. 193, 27 N. E. 263; Matter of Pruyn, 141 N. Y. 544, 36 N. E. 595; Matter of Monroe, 142 N. Y. 484, 37 N. E. 517; Dakin v. Demming, 6 Paige (N. Y.) 95; Tucker v. Tucker, 4 Keyes (N. Y.) 136; Id., 4 Abb. Dec. (N. Y.) 428; Riggs v. Cragg, 89 N. Y. 479. The Surrogate's Court is a court of record (Code Civ. Proc. § 2), and has certain general powers (section 7) and special and limited powers (section 2472). But no power to determine the validity of the administrator's bond is included. That court did not assume to pass on that question, but did have jurisdiction to determine as between the administrators and creditors, and did determine that the agreement was made, and that John G. Moshier and the persons claiming under and through him and Sarah M. Moshier were precluded thereby from claiming as creditors their full percentage of the personal estate of the intestate, but were confined to the residue found in the hands of the administrators applicable to their debts pursuant to the agreement. The legal effect of that transaction as between the parties thereto and the complainant here, the surety, was not considered, and could not have been, as that question was not within the jurisdiction of that court. But the defendants, who have answered, strenuously contend that the agreement and its execution did not provide for and amount to any breach or violation of duty by the administrators, the performance of any illegal acts, and therefore there was no fraud which released the surety. The Code of Civil Procedure of the state of New York imposed on the administrators the obligation and duty to (1) inventory the estate; (2) take it into and reduce it to possession, and protect and preserve it; (3) to ascertain the debts by the publication of a notice to creditors (section 2718); (4) if there was a deficiency of other personal assets with which to pay the debts, to sell the personal property so far as necessary to pay such debts; and, if sold to pay debts or legacies, they might sell on credit with "approved security." Section 2717 says:

"If an executor or administrator discover that the debts against any deceased person and the legacies bequeathed by him can not be paid and satisfied without a sale of the personal property of the deceased, the same, so far as may be necessary for the payment of such debts and legacies, must be sold. The sale may be public or private, and except in the city of New York, may be on credit not exceeding one year, with approved security."

The approved security which they might have taken is limited to national and state bonds and mortgages on real estate. Beebe's Estate, 13 Misc. Rep. 474, 35 N. Y. Supp. 485. By the same case he cannot sell on credit even to pay debts and legacies, except with such "approved security." Even if administrators take an indorsed note which after investigation is supposed and honestly believed to be good, they are not protected. Here by the agreement they were to continue the business as before, or with such changes as they saw fit to make, selling on credit and for the purpose of gain and profit and the eventual benefit of the boys, risking losses, etc. But, again, it was their duty (5) to comply with section 2719, providing: "Every executor and administrator must proceed with diligence to pay the debts of the deceased according to the following order:" (a) Debts entitled to preference;

(b) taxes assessed prior to decedent's death; (c) judgments docketed, etc.; (d) general debts and accounts; and "preference shall not be given in the payment of a debt over other debts of the same class," except in case of judgments and decrees. By the agreement made this section of the Code was to be, as it was, expressly violated. Sales were made on credit, new accounts opened, money was paid for new merchandise, instead of being applied to the payment of debts, preference was to be and was given in the payment of general creditors over others of the same class, to wit, those of John G. Moshier and Sarah M. Moshier, who, in legal contemplation, are now seeking to enforce their unpaid debts against the surety; and all this was to run on for an indefinite period. It was not to be done, and was not done for the protection or preservation of the estate and to make it salable at a good price, as much or more than the then estimated value, but in the interest of the family and to the end they, "the boys," might have it eventually. This was the avowed purpose of continuing the business. It resulted in disaster; for the evidence is uncontradicted that soon after the sale of the stock, etc., to the widow, two of the sons, and another, the widow and one of these sons being the administrators, such purchasers all became insolvent and made an assignment. Presumably their interest in the real estate went in the crash. No court has or can sanction such a dealing with the estate of an intestate. Campbell v. Johnson, 41 Ohio St. 588. It was done in violation of law clearly. It is undoubtedly true that, when the personal estate is solvent, the administrators may turn over the same to the lawful distributees, retaining enough to pay the debts, without sale, and in such case, if the requisite notice to creditors to present claims has been published and a judicial settlement had, any creditor who has not presented his claim is relegated to his remedy against the distributees. If no judicial settlement has been had, and the time to present claims and the time within which creditors are to present claims and enforce them against the administrators has expired, the administrators may safely make distribution, even without an accounting, and in such case, while they may be required to account, they can only be charged with the value of the estate while they held it as administrator and at that time. They cannot be charged with any profits or increase of value subsequent to the time distribution was made, or subsequent to the time they took possession as owners if they be distributees. Matter of Mullon, 145 N. Y. 98, 39 N. E. 821.

The point is raised that this court has no jurisdiction; that while the complainant is a foreign corporation, and defendants are citizens and residents of New York, the amount in controversy is not over $2,000. But the question is the validity of the bond of $40,000, and, if held nonenforceable because of the wrongs of the defendants, it will exonerate complainant from the payment of over $2,500 thereon. I think this court has jurisdiction.

I have not gone into the question whether the agreement and action under it constituted a change of the contract for the performance of which the surety became liable. The parties to the transaction and to be benefited by the bond clearly made a contract, which the administrators were to perform as such, when appointed, and which they did

perform, utterly at variance with the obligation the administrators undertook to perform and agreed with the surety they would perform. The administrators and beneficiaries did not change the contract they made between themselves, nor did they change the contract or trust obligations the administrators became obligated to perform. They could not. But it is unnecessary to speculate on that feature of the case, as the sureties were released by reason of the fraudulent concealment. 2 Pomeroy's Eq. Jur. p. 1621, § 907, where it is said:

"Wherever a contract is in its essential nature intrinsically fiduciary, the utmost good faith and the fullest disclosure of material facts are required from the parties, without any reference to their prior or collateral relations, or to the circumstances surrounding the particular transaction. Any concealment of a material fact known to a party would necessarily be fraudulent. The most familiar and illustrative example of such contracts is that of insurance. The contract of suretyship, in the relations between the surety and the other parties, and especially the creditor, is also fiduciary, although not in the same degree as that of insurance. It demands good faith towards the surety, and, while the creditor is not absolutely bound voluntarily to disclose every fact which might affect the contract, very slight incidents and collateral circumstances will render his concealment of material facts fraudulent."

And in a note the author cites many cases.

The complainant will have a decree adjudging the bond in question void as to and between the complainant and Sarah M. Moshier and Albert C. Boshart, individually, and also between it and said Boshart, as executor of the last will and testament of John G. Moshier, deceased, and perpetually enjoining and restraining them and each of them, their agents, and attorneys, assignees, and successors, and all persons acting in their behalf, from instituting any proceedings or commencing or prosecuting any action or actions or proceedings in their name or behalf, or in the name or behalf of their assignee or successor individually or as such executor, to enforce such bond in their interest or behalf, or in the interest of any such assignee or successor, or to collect from such Fidelity & Deposit Company of Maryland on account of such bond the amounts decreed paid to them, respectively, viz., $660.79 to them or Ryel & Merrill, their attorneys; $1,968.05 to Sarah M. Moshier; $742.83 to Albert C. Boshart, and $19.01 to him as such executor, by the decree of the Surrogate's Court of the county of Oneida, N. Y., made December 1, 1902.